Filed 1/27/23 P. v. Chance CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LESLIE JENEA CHANCE,<br><br>Defendant and Appellant. | F081768<br><br>(Kern Super. Ct. No. BF166441A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Charles R. Brehmer, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Leslie Jenea Chance was convicted of murdering her husband. She raises several challenges to the resulting judgment. We conclude law enforcement should have disclosed several interviews to the defense but find the error nonprejudicial. We otherwise reject defendant's claims and affirm the judgment.

## BACKGROUND

In an information dated September 15, 2017, the Kern County District Attorney charged defendant with murder (Pen. Code, § 187, subd. (a).)[1] The information alleged the murder was carried out for financial gain (§ 190.2, subd. (a)(1)), and defendant personally and intentionally discharged a firearm during the murder causing great bodily injury or death (§ 12022.53, subd. (d).)

Defendant's first trial ended in a mistrial due to a late-discovered conflict of interest involving her trial counsel. After a second trial, the jury convicted defendant of murder and found true the firearm enhancement. The jury found the financial-gain-murder special circumstance not true.

The court sentenced defendant to a prison term of 25 years to life for murder, plus 25 years to life for the section 12022.53 enhancement.

## FACTS

*Events of August 25, 2013*

In August 2013, defendant's husband Todd Chance drove a black Ford Mustang. Defendant's eldest daughter, Jessica B., said that Todd always drove the car, and she never saw anyone else in the family drive it. Todd's best friend, William Glapenske, testified that Todd was "strict" about being the only one allowed to drive the car. He was "meticulous" about it and kept it "clean 100 percent."

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

At about 7:45 a.m. on August 25, 2013, a friend of a neighbor saw a vehicle back out of defendant's driveway. It was a nice, fancy, clean car. The driver was a man, and the passenger was a woman wearing a baseball cap and large sunglasses.

Sometime between 9:00 a.m. and 9:30 a.m., an irrigation worker found the body of a man lying in the "fields" where he worked. The worker had been by that area earlier that morning, sometime around 6:00 a.m. to 7:00 a.m., and the body was not there at the time.

A driver's license in a wallet found in the man's pocket listed the name Todd Chance. There were also $20 in the wallet.

At 9:00 a.m., a woman named Martha Medina was drinking coffee with her husband at her home near the intersection of Tigerflower and Wheatland. A black Mustang car pulled up and parked nearby. According to Medina, a woman wearing a cap, sunglasses and a backpack exited "very fast" from the vehicle "like she was fleeing." She walked toward Wheaton and turned right. Medina thought something was wrong, so she called the police.

Juanita Pinheiro lived near the Medinas and also saw the woman in a baseball hat and sunglasses as she closed the driver-side door of the Mustang. The woman was holding a purse and wearing a backpack. The woman walked down Tigerflower, turned onto Wheatland, and turned right on Dennen heading south.

A video recording device at 6216 Dennen Street recorded the woman walking down the road southbound.

Video footage from a Starbucks on Colony Road and Panama Lane (two blocks east of Dennen Street) was also played for the jury. In the footage, the same woman (according to Pinheiro) walks into the Starbucks carrying a plastic bag. Inside the plastic bag was a round, yellow lid that appeared to be a bottle of bleach wipes.[2] Viewing this

---

[2] The prosecution introduced cannisters of Clorox and Lysol wipes as evidence. Colbert testified that the cannisters were what he believed were in the white plastic bags

footage caused concern for Detective Brewer because bleach can destroy DNA. A law enforcement investigator walked from 6216 Dennen to the Starbucks on Panama Lane and it took eight minutes and 44 seconds.

Video footage from a nearby Lowe's showed a person walk up to a wall and stop for a few minutes near a trash can. The trash can was searched a few days later but nothing was found. The footage shows the person also approached a pallet of manure and bent down near it for several seconds.

Footage form a nearby Walmart depicted the same person who left Lowe's (according to Brewer). The person made a phone call on Walmart's pay phone and later gets into a taxicab.

A taxi driver testified that on August 25, 2013, he picked up a white woman of average build, around 40 years old, from the Walmart on Panama and Colony. She initially asked that he take her to a different Walmart on White Lane. She later changed her mind and said she wanted to be dropped off at Sam's Club next to Harris Street. She said she changed her mind because "she was going to be walking." He dropped her off at the front of the Sam's Club, but she did not enter, instead walking north through the Sam's Club parking lot toward White Lane. He did not see her go inside the Sam's Club. The taxi driver was later shown a photographic lineup but was unable to identify the passenger.

A video seized from Farmers Insurance depicted the front of a parking lot and the adjacent street, which is Harris Road. In the video, there is a woman who walked

---

being carried by the person depicted in the Starbucks video. The cannisters admitted as evidence were purchased a week or two before trial and were being admitted as exemplars; not the actual cannisters allegedly in the Starbucks video. Defendant observes the labels of the exhibit cannisters indicate they are "disinfectant" wipes without bleach. Colbert believed the packaging on the exhibit cannisters was different from what would have been on them in 2013.

southwesterly before eventually crossing Harris Road and then continuing in a westward direction.

*Walmart Video from Weeks Prior*

The prosecution introduced a video from August 9, weeks before the murder, showing defendant walk into Walmart. She walked through the vestibule, approached a Walmart greeter near the doorway from the vestibule to the store, and spoke with him briefly. The man pointed toward where the store's pay phone was located. Defendant then walked toward where the man had been pointing and left the camera view. Other testimony established that this was the direction where the vestibule's pay phone is located. She was off screen for around seven seconds, and then returned into camera view and walked into the store.

There is another camera angle showing the pay phone itself, but defendant did not appear in that footage. However, a security guard for the Walmart said the pay phone could be seen if one walked into the entrance and simply looked to the right (obviating the need to walk down the hallway where the pay phone was located).

Detective Brewer believed defendant had gone to the Walmart to locate its pay phone. When a detective later asked Jessica what possible reason defendant could have had for being at the Walmart a couple of weeks prior to Todd's death, Jessica became upset and said, "[B]ecause she was planning it."

The jury was taken to view various locations, including the entrance to the Walmart and the hallway where its pay phone is located.

Defendant had two cell phones in August 2013. She kept a cell phone with her 24 hours per day and seven days per week.

*Identifications of Defendant*

Todd's mother, Diana, identified defendant as the woman in the videos depicting Walmart, Lowe's, Starbucks, "a street," and an insurance office.

William Darbee, who had known defendant for "probably about 30 years" because her brother was married to his sister, said the woman in the Starbucks video appeared to be defendant.

Steven Alvidrez worked as a school resource officer for several schools, including Fairvew Elementary where defendant worked. Alvidrez saw defendant "quite often" as part of his job. Alvidrez identified the woman in the Walmart and Starbucks videos as defendant.

Glapenske viewed the videos from Starbucks, Walmart, and the video of a person running from one side of the street to the other.[3] Law enforcement asked him if he recognized anyone in the videos. He said the person depicted was defendant. Glapenske had no doubt the person was defendant based on the way she walked and stood, which was "unique."

Defendant's next-door neighbor, police officer Tiffany Salazar, testified that the person depicted in the video law enforcement showed her of a person running across Harris Road, "looked just like my neighbor, [defendant.]" Salazar identified defendant in another video shown to her by law enforcement, but she could not remember the nature of the video. Salazar did not recognize anyone in the Starbucks video.

*Death Notification and Other Events of August 25*

Jessica B. is defendant's daughter with Alan B., from a relationship she had prior to her marriage to Todd. Jessica first went to defendant's house at noon on August 25 to pick up a bed for her daughter. Jessica asked where Todd was, and defendant said he was at a gun show with his father. Defendant helped Jessica load the mattress into her vehicle, and Jessica transported it back to her house. Jessica then got gas and drove back to defendant's house. While she was loading additional items into the car, a sheriff's vehicle pulled up and asked to talk to defendant.

---

[3] Glapenske initially testified this occurred days after Todd's death but later stated during cross-examination that a month afterwards "sounds about right."

Sergeant[4] Kevin Kimmel testified that he responded to defendant's residence around 2:00 p.m. to notify the family of Todd's death. Kimmel had performed family death notifications between 25 to 100 times in his career prior to that point.

When Sergeant Kimmel told defendant of Todd's death, she cried and tried to call Todd. Investigators showed defendant that they had Todd's driver's license to prove he was truly deceased.

Defendant claimed Todd had left to go to a gun show with his father at 7:30 a.m. that morning. Sergeant Kimmel asked if Todd owned any guns, and defendant said he owned several guns. Kimmel asked if all of Todd's guns were accounted for, and she said that they were. Kimmel asked defendant to confirm the guns were accounted for and she repeated that they were. Kimmel asked her to double check and make sure. She went to check and returned in one or two minutes. She said a .38-caliber revolver with black handgrips was missing.

Sergeant Kimmel felt "odd" about the encounter and began surreptitiously recording it. In his prior 25 to 100 death notifications, he had never before activated his recorder.

The deputy coroner had participated in hundreds, if not thousands, of death notifications. She found defendant's behavior during this notification to be "bizarre." Defendant paced back and forth "a lot" and began repeating statements. The statements were something along the lines of "I just knew in my gut. I knew something was wrong. I had a feeling. I had a feeling." Defendant's repetition of these statements made it difficult to make "headway" during their conversations. The deputy coroner could "probably" count on her hand the number of times people reacted the way defendant did during the death notification.

---

[4] At the time of Todd's murder, Kimmel was a detective in the robbery/homicide unit.

7.

Todd's best friend and cousin, William Glapenske, came over to defendant's house between 3:00 and 5:00 p.m. that day. He noticed defendant was not crying and had no emotion. She asked Glapenske if he wanted any of Todd's possessions. Later, she talked of selling Todd's motorcycle and quad.

During Sergeant Kimmel's notification visit to defendant, dispatch told Kimmel that Todd's Mustang had been located. Deputy Sheriff Kavin Brewer responded to the location of the vehicle at the corner of Wheatland and Tigerflower.

*Events Following August 25*

Jessica testified she felt a little uneasy about a conversation defendant had with Todd's place of employment in the days following the murder. Defendant was talking about returning Todd's work keys and Jessica thought, "[W]ho cares."

Jessica told a detective that defendant possessed a red backpack, which Jessica would borrow sometimes.

Defendant was arrested on August 29 but was released several days later. On August 30, five days after Todd's death, a relative told Jessica there were videos of a suspect in the case. Jessica did not ask to view the videos. Jessica told detectives that she wanted to wait until her sister was grown to see the videos, "just in case" the videos depicted their mother (i.e., defendant).

Defendant was arrested again on December 1, 2016. When defendant was arrested, Jessica went to the sheriff's department and viewed several videos. She was upset and crying the entire time but became really upset at the last video. When the detective asked if her mother, defendant, was depicted in the videos, she said, "I guess," while crying. At trial, Jessica said detectives did not tell her that the last video she saw was taken on a different day. She claimed her identification of defendant in all of the videos was predicated on the assumption the videos were all taken the same day.

8.

*Physical Evidence*

A cell phone was found 25 or 30 feet away from Todd's body. Tire tracks indicated a vehicle proceeded north from the scene.

After the vehicle was transported for processing, Deputy Brewer observed what appeared to be the handle of a handgun protruding from the floor mat. The gun was visible from outside the vehicle when the door was closed. Later examination showed the gun was a Smith & Wesson Model 10, .38 special revolver. A criminalist testified that one of the bullets recovered during Todd's autopsy was fired by this gun found in Todd's car.[5] One of the investigators who processed the vehicle on August 25, 2013, did not smell bleach.

Defendant could not be excluded as a contributor to the DNA profile obtained from swabs of the Mustang's steering wheel and gearshift. In all of the swabs taken of the car, there was no evidence of a third person's DNA.

Swabs of the gun either yielded no DNA or such little DNA that a profile could not be produced. Usually when guns are swabbed for DNA, "a good amount of DNA" is found. A criminalist testified that the low amount of DNA found on the gun in this case is consistent with the gun being wiped with bleach. Similarly, the criminalist was surprised at the amount of genetic material swabbed from the Mustang, which was consistent with the car being wiped down with bleach.

When the Mustang was dusted for fingerprints, only one was found. The print was found on the handle-side edge of the exterior of the driver's side door. The fingerprint was made by defendant's left middle finger.

The computers seized from defendant's house did not show user activity around 7:30 a.m., 8:00 a.m., 9:00 a.m. or 10:00 a.m. on August 25, 2013. The first user activity

---

[5] The criminalist also examined a second bullet recovered during the autopsy, but analysis was inconclusive as to that bullet.

from any computer seized from defendant's house occurred at 11:20 a.m. on a laptop registered to Greenfield Unified School District. At 6:05 p.m. the computer was used to look at a story on "channel Bakersfield" about a body found in a local almond orchard. The next morning, the computer was used to view a different story on channel Bakersfield about a body found in northwest Bakersfield farms. The computer also visited websites for a life insurance company, a bank and a funeral home.

Todd's cell phone was recovered near his body. The phone contained text message exchanges with Carrie Williams, Todd's ex-fiancée who is discussed further below. The phone's first text message exchange with Williams was on May 19, 2012, and its last text message exchange with her was on April 26, 2013. During the exchanges, Williams sent three naked pictures to Todd.

Todd's cell phone had unflattering photographs of defendant. It also had a photograph of defendant firing a gun earlier in the summer before Todd was killed. Defendant testified that the gun she was holding in the picture was the same gun that would later be found in Todd's Mustang after the murder.

*Autopsy*

Todd suffered two gunshot wounds to his chest and a perforating gunshot wound to his right hand. The hand wound indicated the bullet had entered from the palm side of the hand, went through the hand, and struck Todd on the chest. Soot and powder tattooing indicated a "very close-range gunshot wound" (i.e., "probably on the order of a few inches") to the hand.

The trajectory displayed by the wounds indicated the shooter was in front and "probably off to his right" when the shots were fired.

Todd's cause of death was multiple gunshot wounds, and the manner of death was homicide.

10.

*CSI: The Experience*

At the MGM Grand in Las Vegas, there is a family attraction called CSI: The Experience. Its general manager described it as "an interactive crime scene experience" based on the television show, *CSI.*

Participants act as "CSI agent[s]" by collecting evidence, working at various lab stations, and submit a hypothetical crime. One of the stations explains that police can track a person's location if they have their cell phone on. Another station shows how police can use shoeprints in dirt to potentially identify suspects. Another exhibit conveys that microscopic analysis of bullets found in a victim can be traced to a particular gun. One display indicates that bleach can destroy DNA.

Before participants submit their answers as to who solved the "crime," they have a "graduation photo" taken. The photograph is part of the paid experience, you cannot just walk in and take a graduation photo. A "graduation photo" from CSI: The Experience depicting defendant was admitted into evidence. Furthermore, bank statements reflected that defendant purchased tickets to CSI: The Experience a few months before Todd's murder.

*Evidence Concerning Todd's Relationship with Ex-fiancée Carrie Williams*

Carrie Williams and Todd Chance dated from 1990 to 1995. Carrie's best friend was married to Todd's brother.

For a short period of time, Carrie and Todd were engaged to be married. Carrie later cheated on Todd and the two broke up. However, they remained friends. After they broke up, Carrie would sometimes see Todd at her best friend's house.

Todd began dating defendant in 1995 and the two married in 1996. Carrie met defendant at a baby shower while defendant was dating Todd. Carrie said, "[H]ello," but defendant ignored her.

Carrie married someone else in 2008, but they divorced in 2010.

11.

In 2012, Todd sent a message to Carrie on Facebook Messenger saying that she looked pretty in a photograph and asking how she had been. Carrie had not seen Todd since 2007. Carrie replied, "Thank you. How have you been?" Carrie asked if they could be Facebook friends, but Todd replied, no. Later that day, the two began sending text messages to one another.

Todd asked why they could not be "more" than the Facebook friends. Carrie replied, "Aren't you still married?"

Todd asked Carrie to put her bikini on and help him wash his car. Carrie replied, "Yeah, right, Dork. I don't need your crazy wife after me, though. Thanks."

Carrie eventually sent Todd nude pictures of her genitals. Todd responded with "appreciative remarks."

Todd and Carrie's conversation carried on for about three or four hours on May 19, 2012.

In April 2013 the two had another conversation over text messaging. At one point, Todd asked Carrie to come "pose" for him. Todd also asked Carrie what she was wearing to bed. Todd asked Carrie if she wanted to "play" with him. Carrie responded that she did not think it was a good idea and reminded him he was married.

*Defendant's Testimony*

Defendant testified in her defense and denied killing Todd. She said that their relationship was "very good" and denied that they were in financial distress. She also denied knowing of Todd's text messages with his ex-fiancée until several days after his death.

Defendant agreed that, at the beginning of her marriage with Todd, she "watched him like a hawk." Because her prior husband had cheated on her, it set the tone in how she "watched" Todd and was very suspicious of what he was doing. Defendant told Todd's mother that if Todd ever cheated, she would kick him out of the house.

12.

Defendant knew that if Todd died, she would receive $100,000 from one life insurance policy and $250,000 from another. She would also receive approximately $1,100 to $1,200 per month for two of her daughters until they reached the age of 18.

On the evening of August 24, 2013, Todd went to get tacos and returned in his black Ford Mustang. That night, defendant and Todd armed the alarm system and went to bed together. Defendant was the only adult female in the home.

Defendant claimed that on the morning of August 25, she woke up first and went downstairs. She worked on her school district computer that morning. Later, Todd woke up and said he was going to a gun show. When he left, that was the last time defendant ever saw him. Defendant then did laundry and watched television. Nothing unusual happened that day until law enforcement arrived. Defendant said she stayed at home on August 25, until law enforcement arrived.

Defendant said she was "extremely flustered" from the beginning of law enforcement's visit to notify her of Todd's death.

That night, after having been notified of Todd's death, defendant claimed she "broke down" multiple times.

Defendant denied she was the person shown in the videos obtained by law enforcement, except the one from Walmart weeks prior to Todd's death. Defendant said her vision was 20/100 and 20/400, so she needed glasses. The person depicted in one of the videos appeared to be reading something from a distance that defendant claimed she was unable to read without her glasses.

Defendant admitted she had looked up the applicable life insurance policies within 48 to 72 hours of Todd's death.

At trial, defendant was shown the murder weapon and said that it was Todd's gun – the same one she had told detectives was missing on the day of the murder. She testified that it was not common practice for Todd to bring the gun with him in the car.

13.

*Defense Evidence*

Ganro Alvarez testified that he lived on Wheatland Avenue. In August 2013 a Mustang was towed away in his neighborhood. On August 24, 2013, – the night before the Mustang was towed on August 25 – there was a party at a house nearby, and the Mustang was parked there. Sherene Valdez, who lived at the same address as Alvarez, saw the Mustang parked nearby prior to the day it was towed.

Marisol Ravas, who lived on Dennen Street, saw the black Mustang being towed. Ravas had seen the car in the neighborhood one to three times before it was towed. The car was loud according to Ravas.

Sarah Chance, defendant's daughter with Todd, testified that the exhaust of Todd's Mutsang was "very loud." She also testified that she got up at about 10:00 a.m. on August 25 and found defendant at a kitchen table doing paperwork. She did not appear frazzled.

Sarah testified that the person depicted in the Dennen Street video was not her mother because that was not the way she walked. The person depicted at the 16-second and 50-second marks of the Starbucks video was not her mother. It did not look like her and she "wouldn't rush out like that." The person depicted at the 13-second mark and near the 50-second mark of the Lowe's video was not her mother because she did not look like her. Nor was the person depicted in the Farmers Insurance video Sarah's mother because she would not jaywalk, nor would she run.

Samantha Chance, another one of defendant's daughters with Todd, testified that her parents had a loving and wonderful relationship.

Dr. Lori Aragon and Bryan James also testified at trial for the defense. Their testimony is described later in this opinion.

*Rebuttal Evidence*

One of Todd's coworkers called defendant on the morning of August 26, 2013. Defendant accepted his condolences and then started asking about returning his uniform

14.

and keys.  The coworker told defendant that was the last thing she should be thinking about at that time.

## DISCUSSION

**I.  The Trial Court Did Not Err in Admitting Evidence Defendant Attended the CSI: The Experience Exhibit**

Defendant contends the trial court erred in admitting evidence she attended the CSI exhibit.  We disagree.

### *Background*

In a pretrial motion filed on June 3, 2019, the defense moved for an in limine ruling excluding "any speculation by deputies that [defendant] 'may have learned criminal investigation techniques and possibly how to commit and/or conceal evidence in this murder' through a family visit to an exhibit at the Las Vegas MGM."  The motion objected to "any reference to the exhibits, and/or any opinion regarding [defendant's] acquisition of knowledge from the exhibit."

During a pretrial hearing, defense counsel made an oral motion in limine requesting that if evidence of CSI: The Experience is admitted, that a "jury viewing" of the exhibit in Las Vegas occur.  After counsel discussed the possibility of a jury viewing, the court took the testimony of Mark Riehle, an evidence technician with the sheriff's office.  Riehle testified that a few months after August 2013, he went to the CSI exhibit.  The exhibits had sections on fingerprints, impressions, cell phones, tire tracks, and autopsies.  Riehle did not know what defendant saw or did when she went to the exhibit herself.

The prosecutor said he would be able to prove at trial that defendant had attended the exhibit through photographs, statements, and credit card information.  However, the prosecution would "obviously not [be] able to get into exactly what she personally read."

The court ruled that the evidence was relevant, but that there was no foundation laid as to whether defendant had attended the exhibit. The court said it would take defense counsel's oral motion in limine under submission.

In a later pretrial hearing, the court said that it wanted to wait to rule on the admissibility of CSI evidence until hearing from the exhibit's attendant. On June 17, 2019, Jennifer Lant testified in a court hearing that she is the general manager for CSI: The Experience. She described the exhibit broadly and stated that they have no way of knowing which patrons saw which parts of the exhibit. She said the exhibit was "designed for a child like young 11, 12 to be able to learn something about forensic science so we really kind of dumb it down."

After the testimony, defense counsel objected to the CSI: The Experience evidence on the grounds of lacking foundation and Evidence Code section 352. The prosecutor emphasized that the evidence had no unduly prejudicial effect because there is nothing inherently untoward about patronizing the exhibit.

The next day, the court ruled that a video taken of the exhibit would be excluded. The court said that since the video showed the video taker pushing buttons on the exhibits, it was unduly suggestive. However, the court would admit other evidence, such as photographs, concerning the exhibit.

On June 28, 2019, defense counsel declared a conflict. On November 25, 2019, the prosecution renewed its motion to admit the video of the CSI: The Experience exhibit. The same day, the court reiterated its conclusion that the video was unduly suggestive. The court stated that the exhibit manager would be allowed to testify as to what information was contained in the exhibit, and that photographs would be admissible. The court observed that no one would be able to say, except perhaps defendant herself, what parts of the exhibit she saw or did not see.

At trial, jurors learned about the CSI: The Experience exhibit, as described in further detail in the preceding section of this opinion. They learned that one of the

16.

interactive stations in the exhibit concerned cell phones. The station described how police can use cell phones to track a person's location if their phone is on. One of the displays at the exhibit talked about how to get rid of traces of DNA. The display said that bleach can defeat DNA.

*Law*

Trial courts have the discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. (Evid. Code, § 352.) We review a trial court's ruling in this regard for abuse of discretion and will only find error when the court acted arbitrarily, capriciously, or absurdly. (*People v. Caparaz* (2022) 80 Cal.App.5th 669, 683.)

Evidence Code section 1101 prohibits evidence of a person's *character or character trait* offered to prove their conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) It does not render inadmissible other evidence, such as "evidence that a person committed [some] other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident …) other than his or her disposition to commit such an act." (*Id.*, subd. (b).)

*Analysis*

Defendant argues the evidence was inadmissible under Evidence Code section 1101. However, the CSI evidence in this case was not evidence of defendant's character or character trait. Evidence Code section 1101 does not apply.

Defendant cites to the prosecutor's argument that the evidence was relevant to prove identity, premeditation, and planning. He then contends, "However, in hindsight, it appears the prosecutor's theories centered on proving *knowledge*."

Regardless, this is not a situation where the prior act is being offered because it is so similar to the charged crime that it raises an inference of identity. Instead, defendant's attendance at the exhibit was offered to show that she would have *known* to leave her cell phone elsewhere and to wipe down the car and gun with bleach in order to get away with

17.

a murder. It is true this *knowledge* was ultimately used to prove *identity*, but only in the way that *all* relevant prosecution evidence is technically introduced to prove that the identity of the perpetrator is the defendant.[6]

In any event, Evidence Code section 1101 permits *both* knowledge and identity evidence. (Evid. Code, § 1101, subd. (b).) Regardless of whether this is knowledge or identity evidence, Evidence Code section 1101 poses no barrier to admission.

Of course, the evidence must still satisfy Evidence Code section 352. (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404.) But even if this evidence is characterized as identity evidence, and even if that triggers some kind of heightened review under Evidence Code section 352, we are confident the court's ruling was correct as explained below.

### *Probative Value*

The evidence concerning CSI: The Experience established that defendant attended an exhibit which conveyed information relevant to evading law enforcement detection during and after commission of a crime, including law enforcement's ability to locate perpetrators through cell phones and "defeat[ing]" DNA with bleach. This evidence is probative in light of other evidence indicating Todd's car and gun may have been wiped down with bleach and that defendant used a pay phone from the nearby Walmart on the morning of the murder despite usually having a cell phone at all times.

Of course, as defendant observes, the jury was free to infer that defendant attended the exhibit but did not see or interact with the information regarding cell phones, DNA, etc. If so, the CSI evidence would have proven largely unhelpful to the prosecution. But how the jury will evaluate evidence and whether it will accept inferences urged by the prosecution is necessarily unknown when the court makes its ruling on admissibility. At

---

[6] Consequently, we do not think the "similarity" principle described in cases like *Ewoldt* – that "[t]he greatest degree of *similarity* is required for evidence of uncharged *misconduct* to be relevant to prove identity" – is applicable here. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 403, italics added.)

that juncture, the evidence is said to have probative *value*, even though that value may not be realized because the jury later declines the inferential chain urged by the prosecution. In other words, the fact that the evidence is circumstantial, and its value is dependent on other inferences, does not render it irrelevant and inadmissible, but rather goes to its weight. Consequently, we conclude the evidence here had probative value, even though that value would only be realized if the jury accepted other inferences urged by the prosecution (i.e., that defendant would have seen the information regarding cell phones, DNA and bleach, etc.).

### Risk of Undue Prejudice

Against this probative value of the evidence, we weigh the risk of it creating undue prejudice. We conclude there was little risk this evidence would cause undue prejudice. There is nothing unduly prejudicial about attending a family-friendly Las Vegas exhibit. The only "prejudice" would come from the legitimate damage it could do defendant's case through its probative value described above. That type of prejudice is not "undue."

### Conclusion

While the probative value of this evidence was not overwhelming, the risk of undue prejudice was quite low. Consequently, we cannot say the probative value of the evidence was "substantially" outweighed by the risk of undue prejudice.[7]

## II. The Court Did Not Err in Its Rulings Regarding Witness Identifications

Defendant contends the court erred in its rulings on witness identifications of her on recorded videos. We disagree.

---

[7] Defendant briefly adds this error "lightened the prosecutor's burden of proof" and was a constitutional due process violation. We fail to see how. The erroneous admission of prosecution evidence is not equivalent to lightening the prosecutor's burden of proof. In any event, the admission of the evidence here was not erroneous, much less fundamentally unfair.

19.

*Background*

On June 20, 2019, before trial, defendant moved to exclude pretrial and in-court identifications of her as the person depicted in the videos. Instead of describing every detail of each interview, or reproducing them in full, we will highlight below only some representative portions of those interviews for brevity's sake. In each instance the entire interview has been considered, not just the portions described or excerpted below.

## Transcripts of Police Interviews

*Travis Chance*

Officers interviewed Todd's father, Travis Chance, on August 29, 2013. They showed him videos. While showing him the first video, officers asked if the depicted person's "body features or anything at all remind you of anyone?" Later, they asked, "Anything about the way she walks or the clothing or anything that reminds you of anyone at all?" Travis said no. While showing another video where the depicted individual uses a vending machine, officers asked if "she" looked "familiar at all?" Travis said no. Officers followed up, "She doesn't resemble anybody you know at all?" Travis replied, "I can't think of anybody. I can't think of anybody that would do something like that."

At one point, Travis said, "She's just as cool as a cucumber." An officer replied, "Yes, whoever it is. That's absolutely right. This is cold –"

During one of the videos, an officer asked, "Who does it look like?" Shortly thereafter, the officer asked, "Does she have any body movements like anybody you know at all?" Travis said no. The officer followed up, "Run, walk, her physical physique at all? Does she resemble anybody at all?" Again, Travis said no.

Later, the officer asked if the person depicted could be defendant. Travis said, "No. She wouldn't do that[.]" The officer replied, "What if I told you we believe it is?" Travis reiterated that he could not imagine the mother of his grandchildren doing such a thing.

20.

Travis said the person depicted in one of the videos was too short to be defendant. The officer replied that because the video was taken at a downward angle, a viewer cannot tell someone's height.

The officer told Travis that they did not believe defendant's account and that other people believed the videos depicted defendant. Travis sobbed.

The officer again showed him a video and said,

> "Travis, keep in mind that we believe she's wearing several sets of clothing to make herself look more patted than what she really is. Look more at the facial features, the way she walks, movements, and see …."

Travis said he had not seen defendant walk except in the kitchen.

The officer asked if one of the videos depicted defendant and Travis said, "It's all distorted. I really don't want it to be her." Later Travis repeated, "I really don't want it to be her. Oh God, what's them kids gonna do?"

### *Diana Chance*

Officers also interviewed Todd's mother, Diana Chance, on August 29, 2013. They asked what Travis had told them. Travis told her she probably knew what was going on. Diana said that because of a search warrant being executed at the house, she figured law enforcement was looking at "the wife." Officers said, "We looked at several different avenues but we ended up getting taken down an avenue that led us straight to the wife."

When they showed her a video, the following exchange occurred,

> "OFFICER 2: There will be a female up here, right here, and walk right down here. You're not going to be able to see her face. It's too far away but see if there's anything that strikes you about that."

> "CHANCE: Yes. It's the stride. The deliberate I'm in control stride.

> "OFFICER 2: And what does that strike you as?

> "CHANCE: It looks like her. Oh, God.

21.

"OFFICER 2:        Here's the other half.  She comes from here and then just keeps going.  Is it her stride?  Look like her walk?

"CHANCE:          Yes, it is. It is.

"OFFICER 2:        Her build?

"CHANCE:          Yes."

Later, Diana also mentioned the "swing in the arms."

### Samantha Chance

Detective Brewer interviewed Samantha Chance on December 1, 2016.  He told her, "There's video.  We have videotape from several different locations.  We're convinced who the suspect is."  Brewer asked Samantha to watch the video of the person walking away from Todd's car and to tell them if she knows who it is.  Samantha agreed, but Brewer said they would do it "in a minute" because the computer was being set up.  In the meantime, Brewer asked Samantha if defendant had ever said why she had been arrested.  Samantha said, "Not really."  When asked if defendant attended Todd's funeral, Samantha said, "Not that I know."  Brewer told Samantha defendant had not called "us" (i.e., law enforcement) for the three or four years the case had been pending.  Samantha stated that was odd.  When asked if she ever thought defendant would kill her dad, Samantha responded, "No."  Brewer then asked, "Do you think it's possible now?"  Samantha replied, "No."  Brewer then told Samantha:

> "Samantha, listen, I know this is the hardest thing you're ever going to do in your life.  It really is.  And if I didn't have to do it, I absolutely wouldn't do this.  We wouldn't be talking to you at all but it's really important to us, okay?  Because your dad's worth it.  Your dad was really worth it.  He really was, okay.  Your mother told us that she stayed home that whole morning.  She never left.  Did you know that there was a neighbor that saw a woman in the car back out of the driveway and drive off with your dad that morning?  Adult woman with sunglasses on and a hat.  She lived with the policeman that lived next door.  She was in the driveway.  Your mother never told you that?  Has she told you anything about what the evidence was against her at all?"

Samantha responded, "No."

Eventually, Detective Brewer showed Samantha several videos. At one point, he asked if a person depicted looked familiar. After she said no, Brewer asked if it could be her mother. After she again said no, Brewer asked her if she was sure. Samantha said that she was sure. During another video, Brewer asked, "Is that your mom?" Samantha replied, "Huh-uh. I have no idea."

Later in the interview, Detective Brewer said that "many" other people identified her mother from these videos. He went on to reiterate, "Several more people … look at this video and say that's absolutely your mom. It is. It's absolutely your mom." At several points Brewer tells Samantha a video depicts her mother. Brewer also repeatedly tells Samantha her mother was the killer. He also said, "This is the way your mom walks, isn't it?"

Another officer repeatedly asks Samantha if the person depicted is her mother.

### Sarah Chance

Law enforcement also interviewed Sarah Chance on December 1, 2016. The interviewing officer asked Sarah if she knew they had video of her mother on the day of the murder. Sarah said she did know because her dad's cousin, Billy, had told her. However, Sarah said she would not believe it until she saw it.

After being showed videos, Sarah said they did not depict her mother. At one point, the officer says,

> "Is that your mom? Is that your mom, Sarah? There's a reason I'm asking you this. You haven't looked at this video over the last three years and it absolutely identifies your mom in every video."

Later the officer told Sarah that her mother killed Todd by shooting him in the car.

### Jessica B.

Officers interviewed defendant's daughter, Jessica B., on December 1, 2016. An officer told Jessica at the beginning of the interview that her mother's recent arrest was "not like last time where we arrested her and a couple of days later they decided not to

23.

file right now and wanted more work done." The officer continued, "Well, the work's been done and we had some stuff develop within the last couple of months that has really turned this investigation in a big right turn and this has determined that stuff. There's some things we've had from day one and that we know with statements and identifications that were made that nothing has changed since. What we don't have is maybe a why and that maybe we thought you girls could help us. That's why you're here…."

Later, the officer asked Jessica if she thought it was odd that her mother started to give Todd's stuff away four or five hours after he was murdered.

Officers showed her a video and asked, "Do you recognize the walk?" Jessica asked, "Do you have the backpack because I would tell you if it was the backpack that I think it is?"

At one point, Jessica asked if they could freeze the video. The officer said, "Uh-huh. Is that your mother?" Jessica cried. They again asked if it was her mother and she replied, "Yes." The officer then asked, "Is that your mother at all in the videos?" Jessica responded, "I believe so."

The officer then said, "Let me tell you why this one here is important…. This is one week before the murder." He said she asked where a pay phone was, and then looked to see. He then asked Jessica, "Can you think of a reason why she asked that man where the payphone is?" Jessica replied, "She was planning it."

The officer later told Jessica "there's a lot of people that's looked at this video right here and told us that's the way she walks."

### *Ken Chichester*

Officers interviewed Ken Chichester on September 19, 2013. Chichester knew defendant from his work as the assistant superintendent for personnel.

Officers told Chichester that they had recovered video of someone they thought was involved in the murder. They told Chichester that they wanted him to watch several

24.

videos to see if he recognized anyone. They then said Chichester was probably aware that defendant had been arrested and released previously.

After or during a viewing of one of the videos, Chichester said, "I mean I can't tell by the face but the body type would be similar." Later, Chichester said, "That looks like it would be her." Later still, Chichester said, "Certainly similar but I couldn't say 100 percent if that's her or not." Chichester repeated the sentiment later, saying, "I couldn't say that's her." He also said he could not *eliminate* the possibility it was her.

Chichester told officers, "The hair color appears to be the same. The body shape is the same. The roundish face is the same but not the definition, I can't tell that's her." Later, he said, "[Y]ou could've showed me that whole video and I would've one through and said … I don't recognize anybody in that video. But once I knew what you were kind of looking for, then I said we'll go back to it because I'm sure that's the person of interest because I know her…."

### Deputy Steven Alvidrez

Deputy Steven Alvidrez was interviewed on September 18, 2013. Detective Colbert told Alvidrez:

> "Okay. What I'm about to do and I showed you a video before and I believe you said it looks familiar and it looked similar to Miss Chance. I'm going to show you a series of videos starting with the one that's on the screen in front of you. This is from this Starbucks over on Panama Lane. If you see anybody that you recognize just let me know and I'll stop it here in a second. To be facial recognition, it could be body style, walk, how they carry themselves, however you want to identify just let me know."

Deputy Alvidrez said that someone with a "similar body shape" to defendant was depicted in the Starbucks video.

Detective Colbert then said that he was going to show Deputy Alvidrez a couple of photographs. In one of the photographs, defendant was shooting a pistol.

Detective Colbert said that he was going to hold up one of the photographs of defendant and let Deputy Alvidrez compare "the body style, the silhouette, what is called the jowls around the neck."

Deputy Alvidrez positively identified defendant in multiple videos. Deputy Alvidrez said that his identification was based on his contacts with defendant and his viewing of the video.

### Court's Ruling

The court stated its tentative ruling that the identification procedures for Samantha, Sarah, Travis, Diana and Ken were "egregiously overly suggestive." Defense counsel argued that every identification made by anyone interviewed by police should be suppressed, whether the identification was recorded or not. The prosecutor agreed any identifications with respect to those individuals would need to be excluded. However, he argued that officers were not improperly suggestive in Jessica's interview.

The court further described its tentative ruling, which later became the formal ruling of the court, as follows:

> "Not allowing for Samantha, Sarah, Travis, Diane and Ken the identification out of court or in court based on the videos, but allowing Jessica's identification out of court and if she does so in court, based on videos."

The court said that with respect to William Darbee, Steven Alvidrez, and William Glapenske, an Evidence Code section 402 hearing would be held.

### June 20, 2019 Evidence Code Section 402 Hearing

#### Deputy Steven Alvidrez

The court held an Evidence Code section 402 hearing at which Deputy Steven Alvidrez testified. Alvidrez worked as a school resource officer assigned to multiple schools, including Fairview Elementary where defendant had worked as the principal. Alvidrez had "visual contact" with defendant often because he worked with all of the principals on calls for service, safety plans, patrol checks, etc.

26.

Deputy Alvidrez was present when law enforcement executed a search warrant at defendant's office at the school, but he did not perform any searching himself.

Detective Brewer showed him videos in connection with the investigation of Todd's killing. The interaction was recorded. Deputy Alvidrez identified defendant as the person depicted in the Starbucks and Walmart videos. Alvidrez was able to make the identification because he was familiar with how defendant would walk and run.

When asked whether he had met with Detective Brewer before the recording began, Deputy Alvidrez said Brewer gave him an admonition to the effect that the video "may or may not" depict someone he knows.

Deputy Alvidrez also met with detectives on some date before the interview, but he could not recall who was present. Alvidrez did not believe anything was said at the meeting to identify who the suspect might be. No one told him who was on the videos in law enforcement's possession. Alvidrez believed he was shown a photograph of defendant shooting guns at a range so that he could identify who she was.

Deputy Alvidrez did not recall Detective Brewer ever telling him that defendant had been identified as the murderer by her family.

Deputy Alvidrez testified that even if someone had said something suggestive, he would base his identification on what he saw, not on what someone had said. Alvidrez would not lie, nor would he risk his career by saying anything other than the truth.

The court declined to exclude Deputy Alvidrez's identification at trial.

**Tiffany Salazar**

Tiffany Salazar, a police officer with the City of Bakersfield and defendant's neighbor, testified as well. Over the eight or nine years that Salazar lived next door to defendant, she saw defendant many, many times.

Near the end of August 2013, Salazar was asked by the sheriff's department to view some videos. The detectives asked Salazar to review the videos and say whether

27.

she recognized anybody in the video. They said nothing else with respect to who was in the video.

Salazar said she recognized who was depicted in all of the videos except for one: the Starbucks video. The video she "mainly recall[ed]" was the one directed at Harris Road near the railroad crossing depicting a woman running across the road. Salazar recognized the woman by her body shape as defendant. Salazar placed her certainty level at 90 percent certain. Detectives did not do anything to influence her identification.

The court ruled that Salazar would be permitted to identify defendant in the videos at trial.

### Hearing on November 25, 2019

On November 25, 2019, the court asked if there was any issue regarding its identification ruling that the parties wished to revisit. An ensuing discussion showed that it had not yet been definitely decided which witnesses were allowed to identify defendant at trial based on the videos.

### Evidence Code Section 402 Hearing on November 26, 2019

On November 26, 2019, the court held a hearing to receive testimony from William Glapenske and Bill Darbee.

#### William Glapenske

William Glapenske was Todd's "very good" friend. The two saw each other almost every weekend.

After Todd died, the sheriff's department contacted Glapenske and asked him to look at some videos. Prior to Glapenske looking at the videos, the sheriff's department did not say anything about them. However, Glapenske had seen news coverage indicating that it was a woman who had gotten out of Todd's car. Defendant was arrested before he saw the videos, and Glapenske was aware of the arrest.

Glapenske spoke with Diana and Travis, but nothing they said led him to believe the videos law enforcement had depicted defendant.

28.

When he arrived to view the videos, the sheriff's department did nothing to suggest who the person in the videos might be. The interviewing officer did not say that defendant was their only suspect. Glapenske viewed videos at a Walmart, Starbucks and at an insurance agency. Glapenske recognized the person in all of the videos as defendant. Glapenske recognized the way she walked, which he described as "unique." Also, the way she had her hair and hat were the same as when she would do yard work. The identification was "very easy," and he had no doubt it was defendant.

### William Darbee

William Darbee testified that he has known defendant for a little over 30 years and has come in contact with her hundreds of times. Defendant's brother is married to Darbee's sister. Darbee had previously worked as a homicide detective.

Within a month of defendant's arrest, the sheriff's department asked Darbee to view some videos. They asked him to view the videos because the suspect was "possibly" depicted. They did not tell him who the videos depicted. Darbee was aware defendant was the suspect because she had been arrested.

Darbee recalled watching a video depicting Starbucks, the front of a Lowe's, and a third video showing an outside location. The person in the videos appeared to be defendant, though he was not 100 percent sure. Darbee did not recall his identification being recorded.

The court ruled that both Glapenske and Darbee would be allowed to testify about identifying defendant on the videos. The court said it would be important to get testimony before the jury about which videos the two men viewed.

*Law*

" ' "In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) 'whether the identification procedure was unduly suggestive and unnecessary,' and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances." ' "

29.

(*People v. Gonzalez* (2006) 38 Cal.4th 932, 942.) " ' "If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable." ' " (*People v. Phan* (1993) 14 Cal.App.4th 1453, 1461, quoting *People v. DeSantis* (1992) 2 Cal.4th 1192, 1222.)

" 'The defendant bears the burden of demonstrating the existence of an unreliable identification procedure.' " (*People v. Gonzalez*, *supra*, 38 Cal.4th at p. 942.)

Defendant contends that once he carries his burden of showing the identification procedure was suggestive, the prosecution then bears the burden of showing reliability under the totality of the circumstances. He cites *People v. Cooks* (1983) 141 Cal.App.3d 224, a Court of Appeal opinion from 1983, for that proposition.

However, in *People v. Cunningham* (2001) 25 Cal.4th 926 (*Cunningham*), the high court first evaluated the first prong of suggestiveness. (See *id*. at p. 990.) The court then moved on to the second prong and concluded, "[d]efendant has not met *his* burden of establishing unreliability in the totality of the circumstances under federal constitutional standards." (*Ibid*., italics added; see also *People v. Huggins* (2006) 38 Cal.4th 175, 243.)

Perhaps *Cooks* and *Cunningham* can be reconciled by observing that *Cooks* was describing the trial-level burden for establishing admissibility while *Cunningham* concerned the appellate-level burden for establishing error. Even so, the appellate-level burden would apply here, such that *defendant* bears the "burden of establishing unreliability in the totality of the circumstances under federal constitutional standards." (*Cunningham*, *supra*, 25 Cal.4th at p. 990.)

### *The Court Did Not Err in Admitting Jessica's Identification*

Defendant argues the court erred in admitting Jessica's identification because it was the product of unnecessarily suggestive interview tactics.

First, it is important to observe that Jessica's identification occurred after defendant had *twice* been arrested for the murder. This would clearly have a

"suggestive" effect as to who law enforcement believed responsible for the crime. But that kind of "suggestiveness" is not "undue" and "unnecessary" but rather it is the natural consequence of an arrest of a family member.

It is true that interviewing officers may have exacerbated this effect by telling Jessica essentially that the case against defendant was stronger than when she was first arrested, describing some of the evidence against her, and asking suggestive questions. However, the effect of these factors is largely cumulative to the effect of Jessica's preexisting knowledge that defendant had been arrested. In other words, Jessica knew law enforcement suspected defendant before the suggestive identification procedure even began.

In any event, we will assume for the sake of argument that defendant has established the identification procedure was unduly and unnecessarily suggestive. We then proceed to the next question: whether the identification itself was nevertheless reliable under the totality of the circumstances. (See *Cunningham*, *supra*, 25 Cal.4th at p. 989.) We conclude that the totality of the circumstances supports the reliability of the identification in spite of the arguably suggestive context in which it was made.

First, it is clear that Jessica would be quite familiar with defendant's appearance, body shape, manner of walking, etc.

Second, Jessica had a substantial disincentive to implicate her own mother in the murder of her father figure. Jessica was clear that she loved her mother "very much." The strength of this disincentive is further supported by Jessica's attempt at trial to undermine her own pretrial identification of defendant. While she claimed at trial that she had not been told one of the videos was from a different day than the murder, the transcript of the interview shows officers indeed told her that one of the videos was from a week prior.

Third, the transcript shows Jessica asked officers to freeze the video, after which law enforcement asked if the person depicted was her mother, and Jessica cried. They

31.

then repeated the question and she said, "[Y]es." Jessica's request to freeze the video indicates that she was looking closely and taking the identification seriously. She was also given multiple opportunities to confirm the identification, and she did.

In sum, while statements and questions by officers during the identification procedure were suggestive, Jessica already knew defendant had been arrested for the crime. More importantly, and the basis for our rejection of defendant's claim, is that other factors – including the strong disincentive for Jessica to wrongly identify her mother and the apparently detail oriented nature of Jessica' identification – support the reliability of the identification.

### The Court Did Not Err in Admitting Deputy Alvidrez's Identification

We agree Deputy Alvidrez's interview had suggestive components, described above. We must now decide whether the totality of the circumstances indicate the identification was nonetheless reliable. For the reasons below, we conclude there was a sufficient basis for admitting Alvidrez's identification.

First, Deputy Alvidrez testified that before the recording, law enforcement admonished him that the videos "may or may not" depict someone he knows.

Second, Deputy Alvidrez expressly stated during the interview that his identification was based on his personal knowledge of defendant and his personal viewing of the video. At the Evidence Code section 402 hearing, Alvidrez made clear that he would never identify someone based on a suggestion by a civilian or a law enforcement officer.

Third, Deputy Alvidrez seemed quite confident in his identification of defendant. While defendant insists that this should not be a relevant factor in light of psychological research, the fact remains that longstanding case law establishes its materiality in the present inquiry. (See *People v. Sanchez* (2019) 7 Cal.5th 14, 35 [" 'level of certainty' " relevant factor].)

Defendant argues that court applied a "different standard" to Deputy Alvidrez because he was a law enforcement officer. She points to the court's comments emphasizing or comparing law enforcement officer identifications to "civilian" identifications. The fact that the court found it relevant that Alvidrez was a law enforcement officer is not equivalent to applying a different standard. Instead, the court was permissibly engaging in its role of making inferences of fact in the context of its reliability determination. A court can reasonably conclude that a law enforcement officer is more likely to approach his role as a "witness" in a criminal investigation with solemnity and seriousness and is more on guard against cognitive biases and improper influences in that context, than perhaps a nonlaw enforcement witness might be. In any event, we review the court's ruling not its reasoning.

### Defendant Has Not Established Error in the Court's Ruling on Other Video Identifications Admitted at Trial

Defendant also broadly attacks the admissibility of the video identifications by Salazar, Glapenske, Alvidrez and Darbee. He insists that because officers used suggestive tactics in recorded interviews, they must have also been used in unrecorded interviews.[8] Even if that were reasoning were sound, it would only satisfy the first prong of our inquiry. Even where an identification procedure is suggestive, courts must determine whether the totality of the circumstances nonetheless render the identification reliable. We cannot merely assume the totality of the circumstances would be in favor of defendant's position as to the unrecorded interviews, especially given our conclusions as to Jessica's and Deputy Alvidrez's identifications. It is an appealing defendant's burden to establish error and prejudice.

Defendant also points to the fact that the officers conducting the identification procedures were not "blind" or "double-blind" – meaning they knew which individual in

---

[8] Defendant says that "[s]upposedly, only *three* interviews were not recorded (Alvidrez [first interview], Salazar, and Glapenske)."

33.

the videos was believed to be defendant. (But cf. *People v. Lucas* (2014) 60 Cal.4th 153, 237, disapproved on another point by *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19 [observing Supreme Court has never required double blind administration of lineups].) Such a procedure, defendant contends, would have avoided the suggestive nature of the recorded interviews. But we have already determined that even with the suggestiveness introduced by "non-blind" administrators, the admitted identifications were reliable under the totality of the circumstances. In light of that determination, the fact that a blind administrator would have likely avoided the suggestiveness present here is not dispositive as to those interviews.[9]

### III.  Law Enforcement's Failure to Disclose Information to Defense was Not Prejudicial

Defendant contends law enforcement's failure to timely disclose certain information to the defense was prejudicial and warrants reversal of the judgment. We disagree.

*Background*

On January 7, 2020, defense counsel said he had been preparing a witness in his office the prior day. The witness told him that two other individuals had been shown the videos allegedly incriminating defendant: Dr. Lori Aragon and Chris Crawford. According to defense counsel, both Aragon and Crawford said they were unable to identify defendant in any of the videos.

Defense counsel observed that there was no law enforcement report reflecting these failed identifications. He described this circumstance as a due process violation and asked for the court to dismiss the case.

The prosecutor said this was the first he had heard of Aragon or Crawford. Detective Brewer said he believed Detective Colbert might have interviewed Crawford.

---

[9] In her reply brief, defendant cites for the first time to a newer statute, section 859.7. We will not address this contention raised for the first time in the reply brief.

Brewer did not know who Aragon was. The court directed Brewer to speak with whomever necessary to determine whether Crawford and Aragon were interviewed and whether a report was prepared. The court said that it was not ready to rule yet given the lack of information but indicated that if there was undisclosed exculpatory information then "CALCRIM 306 would be applicable" at "the very least."

Later that day, Detective Brewer reported back to the court that Detective Colbert had interviews of Crawford and Aragon on his computer. Colbert himself confirmed to court that he and Brewer interviewed Crawford and Aragon in September 2013. Colbert did not believe a report was written concerning these interviews, even though that was his normal practice. Colbert said it was likely an oversight owing to the fact that he had been filling in for Brewer's partner, who was experiencing a family emergency.

Detective Colbert's recollection was that Crawford was 80 to 85 percent certain that defendant was depicted in one or more of the videos. Dr. Aragon could not say whether or not defendant was the person depicted in the videos.

### *Crawford's Interview*

The court and counsel listened to Crawford's taped interview. The court summarized Crawford's interview as follows:

> "My brief synopsis is that at the beginning it appears that it was Detective Colbert and Mr. Crawford based on Detective Colbert's voice….

> "Mr. Crawford, when shown the initial videos – it appeared to be the Starbucks [video] – said that body type was similar, the body movement wasn't. He stated it looked like [defendant's] body type. It looked like the same person coming in and out of Starbucks but he didn't say that it was [defendant] that was the person coming in and out of Starbucks.

> "At one point, he said, 'It's the body type; although, that's all I can say, though. I can't do 100 percent. Maybe 60 percent.' Then later on he talked about the fact that, '[Defendant], I know, walks with a purpose.' Later on again with 60 percent sure then went up to 75 to 80 percent sure.

"It was unclear if that was – if he was sure it was [defendant], at that point, or it was a similar body type at that point. At about the 15-minute-and-42-second mark, Detective Brewer enters the room. Shortly after that, Mr. Crawford said he had never seen [defendant] run. He said, quote, I've never seen her run, end quote.

"He did reference an arm movement in one of the video related to the left arm. That was consistent, he indicated, with [defendant], then at one point said he's 75 to 80 percent sure based on the arm swing.

"At about the 19-minutes-15-second mark, for the first time Mr. Crawford tells detectives to contact Ken Chichester. He's shown the Dennen Street [video]. He says it's the same person. It appears to be the same person walking as he saw in the other clips and then ends up with no more than 80 percent sure that it's [defendant]. It's unclear if it's over all one video or multiple videos, et cetera.

"At 25 minutes and 53 seconds into the interview, Mr. Crawford again says contact Ken Chichester or words to that effect. And after that, he refers detectives to Mike Shaw then later to Lori Aragon then references Deisy that [defendant] worked with closely. I don't know who Deisy is. Maybe a vice principal or something like that.

"And then at the end, as he did at one point during the interview, Mr. Crawford says, 'Well, of course, if my daughter Amy tells me to call, I call the sheriff's department.' I don't know who Amy is .… [S]he must have some connection with somebody in the sheriff's department because that's how he, 'he' being Superintendent Crawford, gets in touch with the sheriff's department."

Crawford told officers that Dr. Lori Aragon was the assistant superintendent for curriculum and would have spent a lot of time with defendant.

The prosecutor later added that at around the four-minute 30-second mark, Crawford says, " '[Y]eah, that looks like [defendant] there.' "

The court said that parts of the interview were "not positive for the defendant" but other parts "could be exculpatory." The court observed that, based on the interview, it was Crawford who told law enforcement to contact Chichester.

The court observed that while Detective Brewer had claimed not to know who Aragon was, he in fact was present when Crawford mentioned her.[10]

The court and parties then listened to Aragon's interview. The court summarized it as follows:

> "[T]his is not an exhaustive synopsis but of note around the 11-minute-52-second mark Dr. Aragon says, 'It's hard to say if the person is [defendant], couldn't really tell anything.' She's then shown some photos or still and says something like it looks like her.
>
> "And then at 12 minutes and 15 seconds, she's shown video again. The video is paused, at some point, about 13 minutes and 15 seconds into the interview. And Dr. Aragon says that 'I couldn't say without a doubt because this person looks thinner to me.'
>
> "The interview continues. At about 13 minutes and 55 seconds, Dr. Aragon says, '[I]f you show this to me and told me look, I couldn't say it was someone I knew." Then later on says, "I couldn't say for sure." Then later on says, "I couldn't say either way." That's around the 15-minute-and-7-second mark.
>
> "At that point, it becomes unclear. It was unclear before as to what exact videos are being shown probably similar ones based on Sergeant Colbert's testimony here in court today. At the 19-minute mark, Dr. Aragon says something like, 'similar body type, yes, but I couldn't swear or say it was her.' The 20-minute-13-sceond mark, 'I don't think I've seen her wear a hat before. I may have but that's a guess.'
>
> "At the 22-minute-and-4-second mark, 'she wears glasses but not sunglasses unless they are prescription,' then says, 'I could not say without a doubt that it's her.' Then at the 23-minute-19-second mark, again, makes a comment about she wears glasses but not sunglasses unless they're

---

[10] Crawford's interview was later played for the jury. In it, the interviewing officer tells Crawford that law enforcement had been showing people "a couple videos." The officer then told Crawford, "You know we are investigating Ms. Chance." The officer confirmed Crawford was familiar with her mannerisms.

The officer told Crawford, "[I]f you see anybody that you recognize, just give me a shout." Crawford asked, "So this is – I'm not being prompted, I'm being asked if I see anybody?" The officer said, "Yes, yes sir. If you see anybody that you may recognize … just let me know."

prescription, something along those lines then talks about glasses some more.

"At the 28-minute-37-second mark, references that [defendant] walks quickly and is asked if that's purposeful by Detective Colbert and Dr. Aragon says yes. Then at about the 37-minute mark, Dr. Aragon references Deisy again."

The court continued,

"At the 38-minute-6-second mark, Dr. Aragon says, 'glasses make me question if it's her.' Then at about 39 minutes and 30 seconds, Detective Brewer starts telling Dr. Aragon about the videos and that there are changes of clothes to conceal identity.

"Then Dr. Aragon says, 'I didn't really notice that,' then Detective Colbert goes into a little more detail as to that subject. Then at the 41-minute-48-second mark, Dr. Aragon says she couldn't say for definite it was her. That's an exact quote.

"At the 42-minute-22-second mark says, 'I couldn't tell one way or the other.' "

Again, the court continued,

"Then after that, Dr. Aragon says that [defendant] was a steady employee. There were no rumors about her that Dr. Aragon knew about and that it's a small district so usually people find out about rumors but Dr. Aragon tries to stay away from that. Doctor Aragon says [defendant] worked hard, loved her kids, family, and work. She was asked a question by the third law enforcement person in the room about was it strange or odd to work late. Doctor Aragon said it was normal to work late.

"And that's about the 45-minute mark in the interview, 'not unusual for [defendant] to work late,' and then Dr. Aragon gives some parallels about the fact she works late and she had worked until 9:00 p.m. or something on one of those recent evenings before Dr. Aragon had been interviewed."

*Further Proceedings*

The court expressed concern that Detective Brewer said that he had no idea who Lori Aragon was when in fact he had sat through a "45-plus-minute interview." The court expressed disappointment in Brewer.

Defense counsel requested that the court dismiss the case.

The court found that the prosecutors did not know about the interviews and there was no prosecutorial misconduct. However, the court said law enforcement should have prepared a report regarding these interviews, and it should have been provided to the defense. The court concluded Aragon's interview contained exculpatory information, but it was not on the level of an alibi or an alternate suspect. However, later the court said that Aragon said she could not determine one way or the other as to whether the videos depicted defendant and that Crawford also equivocates, "is that perhaps partially exculpatory? Maybe; maybe not."

The prosecutor agreed a report should have been prepared and the interviews turned over to the defense. He argued that the remedy should be to allow the defense to call Crawford and Aragon as witnesses.

The court said it wanted to give a version of CALCRIM 306 to the jury. The court said it was important for the jury to know these interviews were brought to its attention by the defense, not the prosecution team.

The court said it would allow the defense to call Crawford and/or Aragon as witnesses. The court prohibited the prosecution from calling Crawford as a witness but could cross-examine him if the defense called him as a witness.

The court gave the jury the following instruction:

> "Both the People and the defense must disclose their evidence to the other side before trial within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence or to counter opposing evidence, or to receive a fair trial.

> "Recorded interviews of Chris Crawford and Lori Aragon, at which time videos of locations you have heard about were shown to each of them, were conducted on September 3rd and September 5, 2013, by Detective Jeff Colbert, at which time Detective Brewer was present for a majority of Chris Crawford's interview and was present for the entire interview of Lori Aragon.

"At the interview of Lori Aragon, Detective Brewer asks some questions of Lori Aragon. Neither one of these interviews were booked into evidence nor were either one referenced in any law enforcement report despite the fact that the practice and protocol within the sheriff's department was and is to book interviews into evidence and to write a brief report about the interviews.

"Neither Deputy District Attorney Andrea Kohler nor Deputy District Attorney Arthur Norris had any knowledge of these two interviews. Not until yesterday, January 7, 2020, were the interviews provided to the defense. Detective Brewer and Detective Colbert failed to disclose these interviews within the legal time period. In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure.

"You must consider what I just told you."

Despite the court's earlier statement to counsel, the instruction did not tell the jury that the interviews came to the court's attention by way of the defense team, not the prosecution team.

Aragon testified at trial that after being shown videos by detectives, she could not determine who anybody was. One of the things that caused her uncertainty was that one of the depicted people was wearing sunglasses. Aragon did not know defendant's prescription.

Aragon felt that, later in the interview, detectives were trying to get her to identify defendant by "feed[ing]" her information.

### Bryan James

On January 9, 2020, defense counsel informed the court that defendant's brother, Bryan James, had contacted his office. James said he had been invited to watch the videos and that he could not say if it was "her" or not. James said, "Billy Darbee set this up."[11]

---

[11] We have previously referred to Bill Darbee, Jr. as William Darbee because that is how he was identified when he testified at trial. Because James refers to William Darbee as Bill Darbee, Jr., we will do the same in this section.

Defense counsel spoke with James who told him that detectives showed him the Walmart, Starbucks and Farmers Insurance videos. James could not identify the person depicted as his sister.

Defense counsel argued that James was not mentioned in law enforcement reports. Counsel requested the case be dismissed. The prosecutor said he needed to "talk to a few people to try to figure out what is going on." The court said that the situation was "very disappointing and more than that." The court said that they would all come back to this issue later in the day.

Detective Brewer testified outside the presence of the jury that in early September 2013, he and Detective Kimmel spoke with Bill Darbee, Sr., his wife, Bill Darbee Jr., and Bryan James. The interview occurred at Bill Darbee, Sr.'s home and was recorded. Brewer brought the recording to court and had it with him as he testified. However, the recording was not booked into evidence. Brewer believed the group was shown four videos, the ones from Starbucks, Lowe's, and Walmart.

Bill Darbee, Sr. and his wife said that they had only seen defendant a few times per year and probably would not be able to identify her. After watching the videos, they said they were unable to identify anyone. Bryan James said that the video was not clear enough for him to identify anyone. Bill Darbee, Jr. said that it appeared to be defendant based on her gait, and some other things.

Detective Brewer prepared a report concerning the interview and entered it into an old computer system at the sheriff's office. Thereafter, the sheriff's office switched to new systems for report writing, evidence booking, communications, and evidence. Everything was supposed to be transferred from the old system to the new system, but apparently not everything transferred.

Detective Brewer acknowledged that Bill Darbee, Sr., his wife and Bryan James are not mentioned in the law enforcement reports provided to the prosecution and

41.

defense. However, Brewer recalled writing a supplemental report about it. It appeared the supplemental report had been lost.

The court and counsel listened to the recording. Afterwards, the court recalled that Bill Darbee, Jr. had testified before the jury on December 16, 2019, and was still subject to recall. The court said,

> "My observations were that his demeanor, at the time that he testified, was sad, that he was so disappointed that it was [defendant], that he had to identify [defendant] in the videos and how horrible that was that he had to do that, which seems to be quite different than the apparent cavalier attitude he expresses, at least that appears to be what is expressed in the recording.
>
> "In the recording also he seems to be attempting to – it's not the detectives that are strategizing with him but he … appears to be attempting to strategize with the detectives and pause at theories and try to actively assist the detectives. And, at one point, says something like 'yeah, there's some information that [defendant], in custody, said they don't have anything on me. I'll be released soon.' "

Defense counsel added that at one point Detective Brewer said, "Well, this has already been shown to a number of people on Todd's side of the family and they're all saying it's her."

The court expressed concern that the cross-examination of Bill Darbee, Jr. might have gone differently had the defense known of this interview. Additionally, the court considered the other three witnesses' inability to identify defendant would "fall under the exculpatory category." The court said it was a "clear discovery violation."

The prosecutor acknowledged "significant mistakes" and negligence on the part of the sheriff's department.

The defense requested to strike Bill Darbee, Jr.'s testimony, which the court denied since he was still subject to recall as a witness. The court would allow the defense to play the recording of the law enforcement meeting with Darbee, Jr., his parents and James.

When trial resumed before the jury, the court then instructed them as follows:

"I do have something I need to read to all of you. This is a jury instruction. You'll receive a written version of this at the end of the case. It is similar to the instruction that I read to you the other day but not the same. So you must consider what I'm about to tell you.

"Both the People and the defense must disclose their evidence to the other side before trial within time limits set by law. Failure to follow this rule may deny the other side the chance to provide all relevant evidence to counter opposing evidence or to receive a fair trial.

"On September 3, 2013, Detectives Brewer and Kimmel, with the assistance of Bill Darbee, Jr., who testified this case … on December 16, 2019, met with four individuals at the home of Bill Darbee, Sr., to show those four individuals videos from Starbucks, Walmart, and Lowe's. Those videos were from August 25, 2013.

"In addition to showing the videos, the meeting was to ask those individuals questions. In addition to the two detectives, the four individuals present were Bill Darbee, Jr., Bill Darbee, Sr., Patty Darbee, who is the wife of Bill Darbee Sr., and Bryan James, the brother of … the defendant, and the brother-in-law of Bill Darbee, Jr.

"The meeting was audio recorded by Detective Brewer. A report of the meeting was prepared by Detective Brewer. The report of the meeting was never provided to the district attorney's office. Neither one of the deputy district attorneys in this trial, Ms. Kohler or Mr. Norris, were ever provided a copy of either any report or any recording.

"In addition, neither any report nor any recording was ever provided to any defense attorney ever that represented … the defendant. The recording of the meeting was never booked into evidence.

"In the evening of Wednesday, January 8, 2020, Bryan James contacted via email defense counsel, Tony Lidgett's office, advising Mr. Lidgett's office that the meeting had happened back in 2013 in September.

"If Bryan James had not sent the unsolicited email to Mr. Lidgett's office, neither defense counsel, the prosecutor, nor the jury would have ever known that this meeting had taken place or had been recorded.

43.

"Mr. Lidgett promptly brought this issue to the Court's attention first Thursday, yesterday, January 9, 2020. I, the judge, immediately directed the prosecution team to locate any report and to locate any recording of the meeting.

"The Kern County Sheriff's Office changed databases in February of 2017, and the report has not been located despite the fact that nothing else had apparently been lost. The recording of the meeting has been located by Detective Brewer on a flash drive maintained by Detective Brewer.

"You, the jury, will get to listen to this recording today. Detective Brewer failed to disclose this meeting and that it was audio recorded within the legal time period. In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

James testified that, when shown the videos alongside the Darbees, he could not tell if it was defendant or not. The video was taken from "far" away, and he "couldn't say yes or no."

James's impression from the interview was that police believed defendant was guilty. James did not believe defendant was capable of this type of crime.

The parties later stipulated that Bill Darbee, Sr. and Patty Darbee did not say "one way or the other if … the defendant, was in the videos from August 25, 2013, at Starbucks, Walmart, and Lowe's."

*Law*

A criminal defendants' sole means of compelling disclosure of information from the prosecution is found in chapter 10 of part 2, title 6 of the Penal Code. (§ 1054.5, subd. (a).) That statutory scheme requires that the prosecutor disclose "exculpatory evidence" to the defense (along with several other categories of information). (§ 1054.1, subd. (e).) Generally, such disclosures must be made 30 days before trial, though disclosure can be denied, restricted or deferred upon a showing of good cause. (§ 1054.7.)

In the event of a discovery violation, the court may order immediate disclosure, initiate contempt proceedings, delay or prohibit the presentation of evidence, continue the

44.

matter, or make any other lawful order. (§ 1054.5, subd. (b).) The court may also prohibit the testimony of a witness if all other sanctions have been exhausted. (*Ibid.*) However, the court may not dismiss a charge, unless dismissal is required by the federal constitution.[12] (*Id.*, at subd. (c).)

Under the federal constitution, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady v. Maryland* (1963) 373 U.S. 83, 87.) "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282.)

To establish the prejudice element of a *Brady* violation, the defendant must show " 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." (*Strickler v. Greene*, *supra*, 527 U.S. at p. 289.)

*Analysis*

Defendant argues the withholding of the evidence prejudiced his motion to exclude all video-based identifications because they would have provided additional examples of suggestive tactics by law enforcement interviewers.[13] Specifically, they

---

[12] While we accept the trial prosecutor's concession that the prosecution (due to law enforcement's negligence) failed to comply with *statutory* discovery requirements by failing to disclose the interviews to the defense under section 1054.1, et seq., the question on appeal is a constitutional one.

Defense counsel expressly declined to ask for a mistrial. He requested dismissal of the case, which the court denied. Under section 1054.5, subdivision (c), the court only erred in that ruling if the federal constitution required dismissal.

[13] Defendant argues the admonitions the court gave the jury would not affect prejudice to her pretrial motion to exclude. We agree.

provide further examples of law enforcement telling interviewees that they were convinced of defendant's guilt, that others had identified defendant from the videos, that the person depicted in the videos was the same and that the videos were sequential, that the person could have or did change clothes, and describing other evidence against defendant. We conclude defendant has failed to establish prejudice.

We agree that these interviews were additional examples of suggestive tactics by law enforcement. We also agree that the prevalence of suggestive tactics by law enforcement across multiple recorded interviews raises an inference that similar tactics were used in unrecorded interviews. Therefore, the undisclosed interviews were relevant to the pretrial motion to exclude. However, concluding that suggestive tactics were used is merely the first of two critical inquiries for admission of identifications in this context. The second is to consider *all* the circumstances and determine whether the identification was reliable in spite of the suggestive conduct by law enforcement. (See *People v. Gonzalez*, *supra*, 38 Cal.4th at p. 942.) The factors and circumstances underlying this second prong cannot be extrapolated from one interview to another. In other words, while we might be able to infer suggestive conduct occurred in unrecorded interviews, we cannot infer that all the *other* circumstances of the interview did not render the corresponding identification reliable. Therefore, even if these three interviews had been disclosed and subsequently relied upon in defendant's motion to exclude, they would not have supplied an adequate basis to make the necessary inferences to prevail on the second prong. That is, while these interviews were relevant to the pretrial motion, we conclude their disclosure would not have changed the outcome as to the admission of the identifications at trial.

Moreover, while the undisclosed interviews are additional examples of suggestive conduct by law enforcement, they also provided additional examples of people clearly resisting such tactics by persistently declining to identify defendant. Four of the six subjects of the three undisclosed interviews – Bill Darbee, Sr., Patty Darbee, Aragon, and

46.

James – said they could not affirmatively identify defendant as the person depicted, despite the suggestive tactics used. Thus, the availability of these interviews at the in limine stage would not solely have worked in defendant's favor.

In sum, while we grant defendant's premise that these undisclosed interviews were additional examples of suggestive conduct, we remain unconvinced that their disclosure would have changed the outcome.[14]

### *Cross-Examination of William Darbee, Jr.*

Defendant briefly suggests the nondisclosure impacted counsel's cross-examination of William Darbee, Jr. However, as defendant acknowledges, defense counsel was able to play Darbee's previously undisclosed group interview and argue to the jury that it "sound[ed] like he was leading the investigation."

Moreover, the court expressly observed that Darbee was subject to recall as a witness after the disclosure. Any questions counsel would have initially asked Darbee on cross-examination absent the discovery violation could have been asked after recalling him as a witness. We find no prejudice.

## IV. Defendant's Ineffective Assistance of Counsel Claim Cannot Prevail on Direct Appeal

Defendant claims trial counsel was ineffective. We conclude the claim cannot prevail on direct appeal.

### *Law*

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the

---

[14] We also reject defendant's citation to intermediate appellate decisions applying an outrageous-police-conduct principle. While the People conceded negligence by law enforcement in this case, the personnel involved did provide nonintentional explanations for the nondisclosures. We decline to find sufficiently outrageous conduct to warrant dismissal under due process principles.

defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Consequently, an appellate court will not find ineffective assistance of counsel on direct appeal if there is even a *conceivable* reason for counsel's omissions. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.)

*Analysis*

Defendant contends trial counsel was ineffective for failing to object to admission of testimony from Diana and Jessica concerning their pretrial identifications of defendant, given that the trial court had excluded all of Diana's identification and some of Jessica's in limine.[15] However, there is a conceivable tactical reason counsel could have had for declining to object. Counsel could have concluded that getting these two examples of suggestive tactics by law enforcement before the jury was "worth" the cost of video identifications that were somewhat cumulative to identifications by Glapenske, Darbee and Alvidrez. While reasonable jurists could disagree about whether this tradeoff was strategically optimal, the mere possibility of a reasonable tactical reason like this precludes reversal. This claim cannot be pursued on direct appeal.

---

[15] The Attorney General contends that the trial court later changed its position after initially indicating it would restrict how much of Jessica's pretrial interview would be admitted. Defendant disagrees. Given our conclusion regarding conceivable explanations for the lack of objection, we need not address this issue.

## V. Cumulative Error

The only true error we have identified was law enforcement's statutory error of failing to timely disclose information to the defense. There are no other errors to cumulate.

## DISPOSITION

The judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P. J.


DETJEN, J.